UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

DAVID WALLACE,                              :
          Plaintiff,                    :     No. 5:15-cv-462
                                            :
    v.                                      :
                                            :
CARPENTER TECHNOLOGY CORP.,                 :
          Defendant.                    :
_____

**MEMORANDUM**
**Plaintiff's Motion for Partial Summary Judgment, ECF No. 19 – Denied**

**Joseph F. Leeson, Jr.**                                                      **March 8, 2016**
**United States District Judge**

## I.     INTRODUCTION

On January 30, 2015, Plaintiff, an active member of the military, filed this action against his former employer alleging violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-2654, the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. §§ 4301-4335, and the Pennsylvania Military Affairs Act ("PMAA"), 51 Pa. C.S. §§ 7301-7319.  Compl., ECF No. 1.  Presently pending is Plaintiff's Motion for Partial Summary Judgment as to the interference claim under the FMLA which, for the reasons set forth herein, will be denied.

## II.    BACKGROUND

### A.     Undisputed Facts

For the reasons discussed below, Plaintiff's Statement of Undisputed Material Facts is considered undisputed for purposes of the motion.  The undisputed facts are as follows:

1. Carpenter Technology is a company which develops manufactures and distributes cast wrought, specialty alloys, and stainless steel high temperature alloys for use in specialty fields, such as aerospace and medical power generation. See Plaintiff's Complaint, at ¶ 7 ("Exhibit A"); Defendant's Answer at ¶ 7; Behun Dep., at p. 10:11-15.[1]

2. In or about October of 2006, Carpenter offered Mr. Wallace a position within Production and Maintenance of Carpenter's Specialty Alloys Operations, at their facility in Reading, Pennsylvania. See Exhibit C (Offer Letter, accepted November 2, 2006).

3. During his employment with Carpenter, he held various positions, including Utility Person, Operator Grinder, Sonic/Billet Inspector and Danieli Grinder Operator. See "Exhibit D."

4. For informational purposes, Mr. Wallace's most recent positions generally involved operating electronically controlled grinding machines to remove surface defects from ingots, billets, slabs, and leader bars to meet standards for size and surface finish, or inspecting materials for internal defects utilizing an ultrasonic reflectoscope. See relevant Position Descriptions attached collectively hereto as "Exhibit E."

5. Mr. Wallace reported to various direct supervisors, as well as Department Managers; Mr. Wallace's supervisors included Christopher Grim, Patrick Downs, Roger Saul, Mike DeCusatis, and Tim Chase (depending on his assigned position), with Grim initially transitioning to Department Manager. See Exhibit D. In or about 2010, Mr. Wallace's Department Manager changed to Eric Albert, and . . . from in or about February of 2012 through the conclusion of Mr. Wallace's employment, his Department Manager was Steve Behun. Id.; and see Behun Dep., at p. 12:5-11.

**II.) Mr. Wallace's Requests for Family and Medical Leave**

6. During all relevant times herein, Carpenter utilized a Third Party Administrator, MetLife, to handle employees' requests for and approval of Family and Medical Leave. See Burkert Dep., at pp. 9:19-24; 10:1-9.

7. Mr. Wallace first sought FMLA leave related to his own serious health condition for Post Traumatic Stress Disorder (PTSD) beginning in early 2010.[1] See January 22, 2010 completed FMLA Healthcare Provider Certification Form from the VA Clinic, attached as "Exhibit F."

---

[1] Defendant admits the facts in paragraphs 7-8, 10-11, 13-14, 16-17, and 23-24, but contends that they are not material to the Motion, that Plaintiff's FMLA leave for his own serious health condition is not at issue in the Motion, and/or that Plaintiff's FMLA leave to care for his son has nothing to do with Carpenter's actions.

8. On May 3, 2010, Mr. Wallace received notice from MetLife that he was eligible for FMLA leave as follows: 2 Day(s) per month from December 6, 2009 through June 30, 2010. <u>See</u> Exhibit G, attached hereto.*

> *This is an amended notice, as he was first provided a letter from MetLife dated April 16, 2010, verifying eligibility from January 14, 2010 through June 30, 2010. <u>See</u> "Exhibit H."

9. In addition to contacting MetLife directly to report FMLA absence needs, Carpenter employees are required to fill out MetLife's "Intermittent/Reduced Scheduled Leave Update Sheet," which they turn in on a weekly basis for their Manager's review and signature (which in turn is submitted to Human Resources). <u>See</u> "Exhibit I"; and <u>see</u> Wallace Dep., at pp. 36:19-24; 37:1-15; 90:8-24; 91:1.

10. Mr. Wallace requested and was approved for FMLA time related to his own serious health condition on the following dates in 2009 and 2010:

December 6, 2009
April 26, 2010
April 27, 2010
May 6, 2010
June 4, 2010
June 5, 2010; and
June 11, 2010.

<u>See</u> "Exhibit J" (CARP751: approvals reflected in top spreadsheet); and see Individual MetLife individual approval letters notifying Mr. Wallace of designation of the foregoing dates as FMLA (attached as "Exhibit K").

11. Most relevant for purposes of the instant Motion, on January 10, 2012 Mr. Wallace opened a new FMLA claim for his son, (submitting information to MetLife, which they inputted into their system on or about January 11, 2012), identifying he was seeking intermittent leave for his son's seizures. <u>See</u> Relevant portions of MetLife claims notes, at p. 1 of 36 (attached as "Exhibit L").

12. . . . MetLife sent him a letter dated January 13, 2012, in pertinent part as follows: "Your request for a leave of absence under the Family and Medical Leave Act (FMLA), state family and medical leave laws and/or your employer's family and medical leave program is scheduled to begin as of December 7, 2011 for family leave." <u>See</u> "Exhibit M."

13. On or about January 25, 2012, Mr. Wallace submitted a completed FMLA Healthcare Provider Certification form, wherein his son's treating physician summarized the serious health condition as follows: "complex partial epilepsy, treated with medication but now with frequent break through seizures that require monitoring and emergency medication." <u>See</u> "Exhibit N." The certification further identified periods of incapacity for Mr. Wallace's son, dates of duration unknown, and that "[i]n the event of a seizure, the child may need to stay home

from school to be monitored, administer medication, provide care, help with activities of daily living & provide transportation to office visits." Id. Mr. Wallace's son's doctor verified a frequency 1-2 times per week. Id. He further identified that his son would need to be seen every three (3) months for office visits. Id.

14. On January 31, 2012, Mr. Wallace was approved for FMLA leave from January 10, 2012 through July 9, 2012, at a frequency of two (2) days per week. See Exhibit O.**

> ** Not material for purposes of the instant Motion, as there may be material factual disputes surrounding this issue, but for informational purposes only: Mr. Wallace repeatedly made known that his First Day Out ("FDO") for FMLA absences was November 7, 2011. See Relevant Portions of Metlife claims notes, Ex. L at pp. 3 of 36, and 6 of 36. He was absent on December 20, 2011 because of his son's seizures and specifically advised management of same, and that he was seeking FMLA protections for said absence. See Exhibit Y; and see Wallace Dep., at pp. 77:4-9; 79:5-19. MetLife's internal claims notes reflect that despite having done so for his prior FMLA absences related to his PTSD, Carpenter refused to honor the December 2011 date as FMLA qualifying time, even though they were on notice of the protected absence(s), and that the FMLA regulations explicitly allow for retroactive designation. 29 C.F.R. 825.301(d).

15. Mr. Wallace requested and was approved for FMLA time for his son on the following dates thereafter:
>March 28, 2012
>March 29, 2012,
>April 3, 2012,
>April 4, 2012,
>May 7, 2012,
>May 8, 2012,
>May 31, 2012,
>July 2, 2012,
>July 11, 2012, and
>July 12, 2012

See Individual MetLife individual notification letters regarding designation of the foregoing dates as FMLA (attached as collectively hereto in chronological order as "Exhibit P").

16. On or about July 12, 2012, Mr. Wallace's son's primary care doctor completed an updated FMLA Health Care Provider certification form, verifying his ongoing need for leave to care for his son for the same reasons outlined in the January 2012 healthcare certification form. See "Exhibit Q." This form identified office visits every 3-6 months, episodic flare ups of the epileptic condition, and potential incapacity of 2 episodes every 3 months, lasting 1-2 days per episode. Id.

17. . . . Mr. Wallace received a notice from MetLife, [dated August 7, 2012] confirming ongoing FMLA approval based upon the updated certification of

health care provider form, of FMLA leave for up to 16 days per year, valid from July 10, 2012 through July 9, 2013. See "Exhibit R."

18. Mr. Wallace requested and was approved for FMLA time for his son on the following dates in the remainder of 2012 and into early 2013:
>August 2, 2012,
>August 3, 2012,
>August 6, 2012.
>August 26, 2012,
>September 17, 2012,
>September 18, 2012,
>November 30, 2012,
>December 1, 2012,
>December 10, 2012,
>December 11, 2012,
>December 13, 2012,
>January 7, 2013,
>January 24, 2013
>February 19, 2013,
>February 20, 2013
>[February 22, 2013]

See "Exhibit P" (all approval letters contained in chronological order).

. . . .

19. Mr. Wallace did not appear for work on Friday, February 22, 2013, as his son experienced multiple seizures during the night of February 21, 2013 going into February 22, 2013 (three (3) in total) for which he needed to tend to his son's care. See Wallace Dep., at pp. 58:13-24; 59:8.

20. Mr. Wallace further contends that as his 6:00 a.m. work shift on Friday, February 22, 2013 approached, he tried to contact his wife to let her know she needed to come home from work early, and attempted to contact his supervisors to let them know he would be running late. See Wallace Dep., at p. 59:9-15. [Mr. Wallace alleges that he] tried calling beginning around 6:00 a.m. to speak with a supervisor to advise he would be running late, but no one answered the phone; at 7:04 a.m. he called the guard shack to formally call out. See Wallace Dep., at pp. 59:17-24; 60:1-8.[2]

---

[2] Defendant asserts that the call at 7:04 a.m. violated the Report-Off Procedure, which requires employees that are unable to report for work to call and report-off at least two hours before they are scheduled to begin work, that Plaintiff was familiar with this Procedure, and that when the leave may be FMLA-qualifying, the employee must also call MetLife. Def.'s Stmt Facts ¶ 20 (citing Wallace Dep. 37:17-39:17, 59:9-60:15 and Report-Off Procedure at Ex. 1 at CARP362).

21. Documentation from Carpenter shows that on Friday February 22, 2013, Mr. Wallace called the guard shack at 7:04 a.m. to report the call off. See "Exhibit S," at p. CARP841.5.***

> ***5 Normal procedure for a "call out" was to contact the guard shack. See Wallace Dep., at pp. 38:23-24; 38:23-24; 39:1-17.

22. Around noon to 1:00 p.m., Mr. Wallace spoke with Department Manager Steve Behun, and explained that he didn't want to take the whole day, and was originally intent on coming in late, but his son had multiple seizures, and ultimately had to call out to care for him. See Wallace Dep., at pp. 83:15-24; 84:1-7.

23. On Monday, on February 25, 2013, Mr. Wallace reported the FMLA leave request for his son through MetLife. See "Exhibit L" at p. 33 of 36.

24. On Monday, February 25, 2013, MetLife generated a letter to Mr. Wallace identifying that the Friday, February 22, 2013 day was deducted from his total FMLA leave allotment, as said absence was eligible for job protected leave. See Exhibit P (at last page of Exhibit, bates-stamped CARP729).

. . . .

26. Mr. Wallace was thereafter "suspended for the latest event of not reporting to work at [his] scheduled shift time" and totality of record. See "Exhibit U" (at p. 2).

27. On or about March 5, 2013, Mr. Wallace provided further documentation to Carpenter from the Children's Hospital of Philadelphia to substantiate the bases [sic] for his February 22, 2013 absence from Carpenter, which stated:

> "David Wallace is currently under my care at the Children's Hospital of Philadelphia Division of Neurology for intractable epilepsy. His father, David Wallace Sr., is his primary care giver at home, and therefore, must take care of his son when he unexpectedly has seizure breakthroughs. Over the course of February 2012, including (but not limited to) 2/22 and 2/26, his son had several seizure breakthroughs and Mr. Wallace was forced to miss work those days.
>
> Mr. Wallace unfortunately cannot predict when his son will have seizures and require his care at home, therefore, when he must call out of work, it is impossible for him to give very much notice. This is why he has filled out FMLA paperwork in the past, and why we are in the process of renewing this. It is medically necessary that he care for his son when needed."

6

See "Exhibit V" (authored by Dr. Jennifer McGuire – the same doctor verifying the prior need for FMLA for Mr. Wallace's son (Exhibits N, and Q)).

28. On or about March 5, 2013, Carpenter (specifically, Steve Behun) informed Mr. Wallace via telephone that his employment was being terminated. See Exhibit U; and see "Exhibit W" (March 6, 2013 Termination Summary Review, effective March 5, 2013).

29. On or about March 6, 2013, Carpenter executed a Termination Summary Review, identifying:
- Failure to/improper report off
- Failure to work as scheduled/failure to work overtime
- Failure to report to the workplace, ready to work at the regular start time
- Totality of Work Record
See Exhibit W.

[Per the Billet Conditioning work schedule, you were scheduled to start your shift on Friday, February 22, 2013, at 6:00 a.m.  You failed to report for work at 6:00 a.m. and you failed to notify your department that you would be arriving late.  You have been warned repeatedly about your inability to report to work for your scheduled start time and your failure to notify or call off before the beginning of your shift start time on numerous occasions in the past.  Your inability to be at work and also your inability to call off in advance of your scheduled start time has been very disruptive.

At the time of the latest event, you were already at Third Step in the Corrective Performance System.  Management has completed a thorough investigation of this incident and has also reviewed your total work history to determine your employment status.  Based on our investigation of the incident and our review of your total work record, which revealed a pattern of unsatisfactory performance, we have decided to terminate your employment with Carpenter, effective March 5, 2013.][3]

30. Steve Behun, Department Manager and a decision maker, testified that the total performance, as part of the basis for his termination was "[b]asically being at work on time, staying your scheduled hours, fulfilling those tasks and then leaving once relieved are part of your work performance, and that was one of the unsatisfactory work performances that Mr. Wallace had. He had issues with attendance and working his scheduled shifts." See Behun Dep., at p. 77:11-21.

. . . .

---

[3]   Plaintiff's statement of facts provides a summary of the incident description within the termination document, which Defendant submits is not a complete and accurate description of the statement.  Accordingly, the entire description is being included.  Defendant also lists additional dates and incidents when Plaintiff was disciplined.  See Def.'s Stmt Facts ¶ 29.

Pl.'s Stmt Facts ¶¶ 1-30, ECF No. 19, admitted in Defs.' Stmt Facts ¶¶ 1-31, ECF No. 24.

### B. Procedural History

Plaintiff initiated this action on January 30, 2015, asserting violations of the FMLA, USERRA, and PMAA.  Compl.  He alleges that Defendants' management exhibited hostility toward his needs for time off under the FMLA to care for his son's epilepsy and, on at least one occasion, threatened to discipline him if he left work.  Compl. ¶¶ 34-38.  Plaintiff alleges that he was terminated for "excessive absenteeism" although a significant portion of his absences were attributable to FMLA leave.  Compl. ¶¶ 12-27.  He claims that these actions constitute interference and retaliation violations of the FMLA, discrimination and retaliation violations of USERRA, and discrimination and retaliation violations of PMAA.  Compl. ¶¶ 40-47.

On March 31, 2015, Defendants, Carpenter Technology Corporation and Carpenter Technology Corporation Foundation, filed an Answer to the Complaint.  Answer, ECF No. 6.  Carpenter Technology Corporation Foundation was dismissed from the action on June 9, 2015.  ECF No. 8.

In a Motion for Partial Summary Judgment filed on December 23, 2015, Plaintiff argues that the undisputed facts show he sought and was formally approved for FMLA leave related to his son's epileptic seizure disorder.  Pl.'s Mot. Summ. J. 1.  Specifically, he was allotted sixteen days per year, from July 10, 2012 until July 9, 2013, of FMLA leave.  Id.  When he was terminated on March 5, 2013, Plaintiff had not exhausted his FMLA leave.  Id at 1-2.  Plaintiff contends he was suspended for not reporting to work as scheduled on February 22, 2013, but that the FMLA mandates that when leave is unforeseeable, an "employee must provide notice to the employer as soon as practicable" and may be excused from complying with the employer's usual

8

leave policy.  Id. (citing 29 C.F.R. §§ 825.303(a), (c)).  Defendant filed a Response to the Motion on January 7, 2016, ECF No. 23, and a Reply was filed on January 14, 2016, ECF No. 27.

## III. STANDARD OF REVIEW

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990).  A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law, and a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 257 (1986).  The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue.  Fed. R. Civ. P. 56; Celotex, 477 U.S. at 324; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323; see also Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992).  "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the

movant's, then the non-movant's must be taken as true." Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993).

## IV. ANALYSIS

The FMLA prohibits any employer from interfering with, restraining, or denying the exercise of or the attempt to exercise, any right provided by the Act. 29 U.S.C. § 2615(a)(1). "The Act's prohibition against interference prohibits an employer from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights." 29 C.F.R. §§ 825.215, 825.220(c). Thus, "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under no fault attendance policies." Id. "Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b).

To prove an FMLA interference claim, "a plaintiff must show that: (1) he was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the employer of his intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he was entitled under the FMLA." Atchison v. Sears, 666 F. Supp. 2d 477, 488 (E.D. Pa. 2009). In proving interference, the plaintiff does not need to prove that the employer acted with discriminatory intent. See Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 312 (3d Cir. 2012). "Thus, because an interference claim is not about discrimination, a McDonnell-Douglas[4] burden shifting analysis is not required when examining a [sic] interference claim like

---

[4] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

it is when considering a retaliation claim." Atchison, 666 F. Supp. 2d at 488. However, "the FMLA does not provide employees with a right against termination for a reason other than interference with rights under the FMLA." Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 403 (3d Cir. 2007).

For purposes of this Motion, Defendant does not dispute elements one through four. Def.'s Resp. Mot. Summ. J. 12. After review, the Court finds sufficient evidence in the record to support these elements. Accordingly, the Court will focus on whether Plaintiff was denied benefits to which he was entitled under the FMLA.

### A. Defendant's Failure to Designate February 22, 2013, as an FMLA Day

Plaintiff contends that although MetLife approved February 22, 2013, as an FMLA day, Defendant designated this time solely as a "sick" day. See Pl.'s Ex. P 16, ECF No. 19-17 (Letter from MetLife dated February 25, 2013, stating that Plaintiff is eligible for FMLA leave on February 22, 2013); Pl.'s Ex. T, ECF No. 19-21 (Printout of all sick and FMLA leave for Plaintiff between July 30, 2007, and February 22, 2013); Pl.'s Ex. BB, ECF No. 19-29 (Email from Defendant's General Counsel dated March 15, 2013, regarding Plaintiff's attendance history, which indicates that February 22, 2013, was a "Sick" day and not covered under FMLA). Plaintiff argues that this was an improper denial of FMLA benefits. Defendants do not address this argument.

The failure to identify February 22, 2013, as an FMLA leave day does not in itself support an interference claim. See Lynch v. Matthews Int'l, No. 08-1717, 2010 U.S. Dist. LEXIS 64261, at *16-18 (W.D. Pa. June 28, 2010) (finding that requiring an employee to use vacation days for absences did not run afoul of the FMLA); Phillips v. DaimlerChrysler Corp., No. 01-247, 2003 U.S. Dist. LEXIS 2394, at *271 (D. Del. Mar. 27, 2003) (determining that the

"Plaintiff suffered no wage loss during his employment with Defendant due to the alleged FMLA violation and thus [was] not entitled to any relief"); Lapham v. Vanguard Cellular Sys., 102 F. Supp. 2d 266, 270 (M.D. Pa. 2000) (explaining that the FLMA "leaves no room for recovery when an employee does not sustain economic loss during the period of his or her employment"). Accordingly, summary judgment on this basis, alone, is denied. To the extent Plaintiff relies on the failure to designate February 22, 2013, as an FMLA day in combination with his termination, his claims are discussed below.

### B. Defendant's Use of February 22, 2013 Leave in Plaintiff's Termination

Plaintiff asserts Defendant considered his absence on February 22, 2013, in deciding to suspend and terminate him, which violates the FMLA. See 29 C.F.R. § 825.220(c) (stating that the FMLA prohibits employers from using "the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions"). Plaintiff alleges that the contemporaneous documentation created at the time of suspension and termination irrefutably demonstrates that the February 22, 2013, date was used as a basis for these actions. Further, Plaintiff submits that Defendant cannot show that its actions would have been taken regardless of his request for FMLA leave. See Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 403 (3d Cir. 2007) (explaining that if the defendant can establish that it terminated the plaintiff for a reason unrelated to his intention to exercise his rights under the FMLA, the interference claim would fail).

Conversely, Defendant alleges that it terminated Plaintiff for violating the Report-Off Procedure on February 22, 2013, completely unrelated to any FMLA leave. Defendant asserts that the Motion must be denied because a factfinder could accept either party's proffered basis for termination. See Lichtenstein, 691 F.3d at 312 (reasoning that the defendant could defeat the

FMLA interference claim if it could demonstrate that its reasons for termination were unrelated to the plaintiff's exercise of her FMLA rights, and that there were factual disputes to preclude summary judgment).

Considering the facts in the light most favorable to Defendant, there is a genuine issue of material fact as to whether Plaintiff was terminated for violating the Report-Off Procedure. The March 6, 2013, Termination Summary Review, identifies "[f]ailure to/improper report off," "[f]ailure to work as scheduled/failure to work overtime," and "[f]ailure to report to the workplace, ready to work at the regular start time." Although an interference claim does not involve the burden-shifting analysis involved in a retaliation claim, it is only a violation of the FMLA to terminate an employee for a reason that interferes with the employee's FMLA rights. Accordingly, because there is a factual dispute as to whether Plaintiff was terminated for taking FMLA leave or for violating the Report-Off Procedure summary judgment is denied. See Beese v. Meridian Health Sys., No. 14-3627, 2015 U.S. App. LEXIS 19108, at *10-11 (3d Cir. 2015) (affirming the award of summary judgment to the defendant on the interference claim because the undisputed evidence demonstrated that the plaintiff was not denied any FMLA benefits, but was issued a final warning because he failed to comply with the defendant's "call-out procedures, which were neutral workplace rules that did not implicate his FMLA rights").

  C.  **Report-Off Procedure as Violative of the FMLA**

Defendant submits that Plaintiff does not dispute that the Report-Off Procedure is "usual and customary,"[5] nor does he contend that any "unusual circumstances"[6] prevented him from

---

[5] 29 C.F.R. § 825.303(a) ("It generally should be practicable for the employee to provide notice of leave that is unforeseeable within the time prescribed by the employer's usual and customary notice requirements applicable to such leave.").

following the Procedure. See 29 C.F.R. § 825.302 ("An employer may require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances."). Defendant therefore claims that it could lawfully terminate Plaintiff for violating the Report-Off Procedure. See Callison v. City of Phila., 430 F.3d 117, 121 (3d Cir. 2005) (determining that because the defendant's "call-in policy neither conflicts with nor diminishes the protections guaranteed by the FMLA, it is not invalidated by the Act" and the plaintiff "was required to comply with the policy and the City did not abrogate his FMLA rights by placing him on suspension for the violations").

However, Plaintiff submits that the Report-Off Procedure conflicts with the FMLA where the need for leave is not foreseeable or circumstances make it impracticable to follow due to, for example, emergency medical treatment. Plaintiff cites Vanderpool v. Inco Alloys Int'l, Inc., wherein the court found that while the plaintiff's "behavior did not comply with the absence notice requirements of the [employer,] . . . a jury could reasonably conclude that [the plaintiff's] behavior did comply with the notice provisions of the FMLA . . . 'as soon as practicable under the facts and circumstances' of his particular case." 1999 U.S. Dist. LEXIS 12363, at *24 (S.D. W. Va. June 3, 1999) (quoting 29 C.F.R. § 825.303).

To the extent Plaintiff suggests that the Report-Off Procedure conflicts with the FMLA, there are factual questions that preclude a decision on summary judgment. Specifically, the Procedure requires employees that are unable to report for work to call and report-off at least two hours before they are scheduled to begin work. Plaintiff testified that he attempted to call in to speak with a supervisor beginning around 6:00 a.m. to advise he would be running late, but no

---

[6] 29 C.F.R. § 825.303(c) ("When the need for leave is not foreseeable, an employee must comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances.").

one answered the phone. It was not until 7:04 a.m. that he reached someone at the guard shack to formally call out. Whether Defendant has voicemail or has made other arrangements for an employee to call in during the early morning hours or in the case of an emergency is a factual question that has to be answered before it can be determined whether the Report-Off Procedure conflicts with the FMLA. Additionally, Plaintiff testified that it was normal procedure to contact the guard shack, which also creates a factual dispute.

### D. Discouragement to Use FMLA Leave

Plaintiff asserts it is undisputed that he requested and was approved for FMLA leave on February 22, 2013, that he alleges he could not always call out in advance of said shift due to his son's FMLA qualifying condition, and that Defendant suspended and terminated him for his inability to call off in advance and to report to work as scheduled. Plaintiff argues that these actions are "quintessential acts of FMLA discouragement, which is strictly prohibited as impermissible interference under the FMLA and resulted in clear prejudice to Mr. Wallace." See 29 C.F.R. § 825.220 ("Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.").

For the reasons previously stated, whether the Report-Off Procedure conflicts with the FMLA raises factual questions for the jury and it cannot be determined whether Defendant's actions violated the FMLA. See Bradsher v. City of Phila. Police Dep't, No. 04-3309, 2007 U.S. Dist. LEXIS 73439, at *12 (E.D. Pa. Sept. 18, 2007) (rejecting the plaintiff's claim that the defendant discouraged her from exercising her rights under the FMLA by disciplining her repeated failed sick checks during those absences because the defendant's sick leave policy was

consistent with and did not violate the FMLA).  Summary Judgment on the basis of discouragement is therefore denied.

## V.      CONCLUSION

For the reasons set forth herein, Plaintiff's Motion for Partial Summary Judgment is denied.

A separate order will be issued.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*_____
JOSEPH F. LEESON, JR.
United States District Judge